**COBB MECHANICAL CONTRACTORS, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

United Association of Plumbers and
Pipefitters, Local Union No. 196,
AFL–CIO, Intervenor.

No. 01–1259.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 23, 2002.

Decided July 23, 2002.

Walter V. Siebert argued the cause for the petitioner.

David A. Fleischer, Attorney, National Labor Relations Board, argued the cause for the respondent. Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell Jr., Attorney, National Labor Relations Board were on brief.

Brian A. Powers argued the cause for the intervenor. Keith R. Bolek was on brief.

Before: GINSBURG, Chief Judge, and SENTELLE and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Cobb Mechanical Contractors, Inc. (Cobb) petitions for review and the National Labor Relations Board (NLRB or Board) cross-petitions for enforcement of the Board's imposition of instatement[1] and backpay awards resulting from Cobb's unlawful refusal to hire nineteen job applicants in violation of sections 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. §§ 151 *et seq.* In particular, Cobb argues that the remedies are not warranted under the Act absent a determination that Cobb refused to hire, rather than merely failed to *consider* for hire, nineteen applicants who were members of Local Union No. 196 of the United Association of Plumbers and Pipefitters, AFL–CIO (Union). Because the United States Court of Appeals for the Fifth Circuit affirmed the liability determination, this appeal deals solely with issues arising from the compliance proceeding, namely how much backpay Cobb is required to pay and what other relief, if any, is appropriate. In limiting our inquiry to the compliance proceeding, like the Board, we reject Cobb's invitation to reconsider whether Cobb would have hired the Union applicants in the first instance absent union animus because that issue was decided at the liability stage. We nonetheless remand to the Board for it to recalculate the amount of backpay owed based on our conclusion that Cobb may have had a nondiscriminatory policy of not hiring plumbers for plumber helper positions and that the end date for the backpay periods should take into account each Union applicant's likelihood of transferring to another

---

1. As used by the Board, "instatement" refers to the employer's obligation to offer union applicants the "positions to which they applied or, if those positions no longer exist, to substantially equivalent positions." *See FES (a Division of Thermo Power), Plumbers & Pipefitters Local 520*, 331 NLRB No. 20, 2000 WL 627640, at *6 (2000).

Cobb project. In all other respects, we deny Cobb's petition for review.

## I.

Cobb, a Colorado corporation, is a mechanical contractor engaged in the business of plumbing, pipefitting and sheetmetal construction. *See* April 26, 1995 Decision of Administrative Law Judge Frederick Herzog at 2 *(Cobb Mech. Contractors, Inc.,* Case No. 16–CA–1643) *(Herzog Decision).* In September 1993 Cobb entered into a thirteen-month contract to perform all mechanical contracting work at two federal prison construction sites, one in Amarillo and one in Dalhart, Texas. The Union represents plumbers, pipefitters and plumber helpers in the Amarillo and Dalhart areas. *Id.* Cobb initially arranged with the Texas Employment Commission (TEC) to handle, on Cobb's behalf, all of the project's employment applications for welder, sheet metal worker, pipefitter, plumber and laborer positions. TEC accepted applications for Cobb from November 10 through November 21, 1993, when Cobb's project superintendent David Sandlin terminated the agreement. *Id.* Sandlin then informed TEC that Cobb no longer required TEC's services because it had hired everyone needed for the project. *Id.* Even though several Union members applied for the various positions available and all had "commercial experience relevant to the Amarillo/Dalhart jobs," none was hired. *Id.* at 3.

On May 31, 1994 the NLRB Regional Director for Region 16 issued a complaint against Cobb based on a charge filed by the Union. *Id.* at 1. Specifically, the complaint alleged that Cobb violated section 8(a)(1) and (3) of the Act by refusing to employ or consider for employment twenty-four applicants because of their Union membership. After a hearing, Administrative Law Judge (ALJ) Herzog issued a decision on April 26, 1995. He found, inter alia, that Cobb "refused to hire Union applicants in violation of sections 8(a)(1) and (3) of the Act." *Herzog Decision* at 11. The ALJ ordered Cobb to cease and desist from "refusing to consider for employment and/or refusing to employ" twenty-two of the applicants. *Id.* at 21. In addition, he required Cobb to offer them "employment in positions for which they applied or, if such positions no longer exist, to substantially equivalent positions, and to make them whole for any loss of earnings and other benefits that they may have suffered as a result of the discrimination against them." *Id.* at 21. Cobb failed to timely except to the ALJ's decision. On June 23, 1995 the Board adopted by order the ALJ's decision and ordered Cobb to comply therewith. *See* June 23, 1995 Order at 1. On June 6, 1996 the United States Court of Appeals for the Fifth Circuit enforced the Board's order, concluding that the Board did not abuse its discretion in rejecting Cobb's exceptions as untimely. *See NLRB v. Cobb,* 91 F.3d 139 (5th Cir. 1996) (unpublished opinion).

The General Counsel and Cobb could not agree on the amount of backpay and benefits due under the Board's June 23, 1995 order. On June 20, 1997 the Regional Director issued a compliance specification and notice of hearing laying out a formula to determine the amount of backpay each discriminatee was entitled to receive. *See* June 20, 1997 Compliance Specification and Notice of Hearing at 1–5. Because, according to Cobb, the Board failed to find that Cobb unlawfully refused to hire any Union applicant, Cobb contended that the backpay remedy was punitive and thus barred by the Act. *See* Cobb's July 23, 1997 Answer to Compliance Specification and Notice of Hearing at 1. Fol-

lowing a compliance proceeding, ALJ Keltner Locke issued a supplemental decision finding, inter alia, that nineteen discriminatees were entitled to backpay totaling $672,890 plus interest and that Cobb had a continuing obligation to offer employment to eighteen of them. *See* May 13, 1998 Supplemental Decision, 1998 WL 1984978 (N.L.R.B. Div. of Judges, 1998), *reprinted in In re Cobb Mech. Contractors, Inc.*, 333 NLRB No. 142, 2001 WL 473984, at *3 (2001) (*Locke Decision*). Cobb filed exceptions to the supplemental decision. Upon review, the NLRB adopted ALJ Locke's findings and conclusions and required Cobb to make the discriminatees "whole" by paying them the amounts specified, plus interest. *See In re Cobb Mech. Contractors, Inc.*, 333 NLRB No. 142, 2001 WL 473984, at *2 (2001). Cobb filed a timely petition for review and the Board cross-applied for enforcement.

## II.

We must uphold the Board's factual findings if supported by substantial evidence in the record. *See Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1232 (D.C.Cir.1992). Furthermore, the ALJ's credibility determinations, as adopted by the Board, will be upheld unless patently insupportable. *See id.* If the Board finds an unfair labor practice, its choice of remedies is given "special respect." *Id.* We examine the remedy selected, however, to "assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act." *Id.* (quotations omitted).

### A. Refusal to Hire/Refusal to Consider

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce in the exercise of rights guaranteed" in the Act. 29 U.S.C. § 158(a)(1). An employer violates section 8(a)(3), and thereby section 8(a)(1), if it refuses to hire or consider for hire an applicant because of his union membership or activity. *See Southwest Merch. Corp. v. NLRB*, 53 F.3d 1334, 1339 (D.C.Cir.1995). In determining whether an employer has committed a violation, the Board uses the *Wright Line* test. *See Wright Line*, 251 NLRB 1083, 1980 WL 12312, *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under *Wright Line*, the General Counsel must make a prima facie showing sufficient to support an inference that the applicant's protected conduct was a "motivating factor" in the employer's decision. The burden then shifts to the employer to demonstrate it would have made the same decision irrespective of the applicant's protected union activities. *See Southwest Merch. Corp.*, 53 F.3d at 1339; *Wright Line*, 251 NLRB at 1089.

As noted above, the Board is accorded broad discretion in fashioning an appropriate remedy. Nonetheless, a proposed remedy must "be tailored to the unfair labor practice it is intended to redress." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900, 104 S.Ct. 2803, 2813, 81 L.Ed.2d 732 (1984). With regard to a backpay award in particular, "it remains a cardinal, albeit frequently unarticulated assumption, that a backpay remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices." *Id.* at 900–01,

104 S.Ct. at 2813 (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 198, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941) ("[O]nly actual losses should be made good...."))); *see also Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1009 (D.C.Cir. 1998) (Board's remedy must be "truly remedial and not punitive"). Consistent with these admonitions, the Board has held that instatement and backpay awards, like those at issue here, are appropriate remedies only if an employer actually refuses to hire a union applicant. *See FES (a Division of Thermo Power) & Plumbers & Pipefitters Local 520*, 331 NLRB No. 20, 2000 WL 627640, at *7 (2000). In contrast, "the appropriate remedy for [a refusal to consider] violation is a cease-and-desist order; an order to place the discriminatees in the position they would have been in, absent discrimination, for consideration for future openings and to consider them for the openings in accord with non-discriminatory criteria." *Id.* at *10. The distinction makes sense because the NRLB's remedial aim is to "*restore* the economic status quo that would have obtained but for the company's wrongful action." *Geiger Ready–Mix Co. v. NLRB*, 87 F.3d 1363, 1371 (D.C.Cir.1995) (quotations omitted and emphasis added). If an employer merely refuses to consider a union applicant, an award of backpay and instatement without proof that the applicant would have been hired absent union animus does not "effectuate the purposes of the Act." *Williams Enters., supra.*[2] The thrust of Cobb's argument is that the Board erred in fashioning an instatement

and backpay remedy because, contrary to ALJ Locke's interpretation, ALJ Herzog did not determine that Cobb refused to hire the discriminatees but instead that Cobb refused to *consider* them for hire. *See* Cobb Br. 14–26.

 The critical issue is whether ALJ Locke's supplemental decision, affirmed by the Board, correctly concluded that ALJ Herzog had determined that Cobb refused to hire, rather than refused to consider for hire, the Union applicants. While acknowledging that "certain statements in ALJ Herzog's decision would appear to support [Cobb's] position," Locke nonetheless concluded that Herzog's decision plainly "embodie[d] a finding that [Cobb] unlawfully refused to hire." *Locke Decision*, 2001 WL 473984, at *4–*5. We agree with ALJ Locke's assessment. In the "Findings and Conclusions" section of the Herzog decision, under the first subheading entitled "Unlawful Refusal to Hire Allegations," ALJ Herzog stated:

> The General Counsel contends, and *I find*, that [Cobb] *refused to hire* Union applicants in violation of section 8(a)(1) and (3) of the Act. [Cobb's] refusal to hire took place both directly and indirectly as [Cobb] utilized [the Texas Employment Commission] as an effective "graveyard" for Union applicants and refused to hire or consider the Union applicants who directly applied or interviewed with [Cobb].

*Herzog Decision* at 11 (emphasis added).[3] While Herzog's decision is at times imprecise, he referred more than once to Cobb's

---

**2.** Cobb reads the Board's declaration that "[i]t is axiomatic ... that the finding of an unfair labor practice is presumptive proof that some back pay is owed" to be erroneous as a matter of law because not all unfair labor practice findings warrant backpay. Cobb Br. at 16–17. But the Board's statement, when read in conjunction with its adoption of ALJ Locke's conclusion that ALJ Herzog had, in

fact, determined that Cobb refused to *hire* the union applicants, is a correct statement of the law.

**3.** The "refused to hire or consider" language used here suggests Herzog found both types of violations, not only an unlawful refusal to consider.

"refusal to hire" the Union applicants. *See, e.g., Herzog Decision* at 11–13. Moreover, his individual treatment of each Union applicant, rather than a general review of the applicants as a group, further indicates that he considered each applicant's circumstances in finding a refusal to hire. *See id.* at 15–17. In addition, Herzog ordered instatement and backpay awards, remedies that follow from a refusal to hire finding. *Id.* at 21.[4]

■ Even if ALJ Herzog did not explicitly determine that all of the Union applicants would have been hired, Cobb was required to file a timely exception to the remedy imposed. In failing to do so, Cobb waived its right to raise the suitability for hire issue. *See* Board's Rules and Regulations, 29 C.F.R. § 102.48(a) ("[I]f no exceptions are filed …, the findings, conclusions, and recommend[ed] order shall … be adopted by the Board and all objections to them shall be deemed waived for all purposes."); *see also* 29 C.F.R. 102.46(g) ("No matter not included in exceptions or cross-exceptions may thereafter be urged before the Board, or in any further proceeding."). The fact that ALJ Herzog reserved for the compliance proceeding only the *amount* of backpay question also put Cobb on notice that the suitability issue had been decided, requiring Cobb to except thereto or risk waiver. *See Herzog Decision* at 20–21.

■ Cobb additionally claims that the Board itself should have reanalyzed the case, or remanded to the ALJ to so analyze, in light of the *FES* decision, which clarified the elements of refusal to hire and refusal to consider cases. *See FES, supra.* In essence, Cobb seeks yet another route by which to reintroduce the question whether it would have hired the Union applicants. Again, however, Cobb failed to properly raise the issue before the Board; accordingly, it is precluded from raising it here. Section 10(e) of the Act provides, in pertinent part, that "no objection that has not been urged before the Board … shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). There are no extraordinary circumstances here. Even though *FES* postdated ALJ Locke's decision by two years, the Board issued its decision in this case one year *after FES*. Moreover, section 102.48(d)(1) and (2) of the Board's Rules and Regulations, 29 C.F.R. 102.48(d)(1) and (2), provides that any material error included in a Board decision can be contested by a mo-

4. Cobb responds by citing Board authority and circuit precedent which, it claims, support its right to raise the suitability for hire issue in the compliance proceeding. *See* Cobb Br. at 19–20 (citing *Southwest Merch. Corp. v. NLRB*, 53 F.3d 1334 (D.C.Cir.1995), and *Great Lakes Chem. Corp. v. NLRB*, 967 F.2d 624 (D.C.Cir.1992)). At the outset, we agree with Cobb that if ALJ Locke or the Board had thought that the issue was unresolved, it *could* have been considered at the compliance proceeding. The cited cases indicate that ALJs have sometimes reserved the question whether an employer would have hired particular discriminatees for the compliance proceeding. This does not mean, however, that an employer is entitled to raise a discriminatee's suitability for hire whether or not the ALJ reserved the issue at the liability stage. Moreover, the procedural posture of both *Southwest Merch.* and *Great Lakes Chem.* materially differs. Having concluded that the *Southwest Merch.* and *Great Lakes Chem.* employers had not had the opportunity to challenge whether particular employees would have been hired, we further concluded, based on Board policy, that the employers would have the opportunity in subsequent compliance proceedings. *See Southwest Merch.*, 53 F.3d at 1345; *Great Lakes Chem.*, 967 F.2d at 629–30. In *Southwest Merch.* and *Great Lakes Chem.*, the Board had issued reinstatement orders to broad classes of employees without considering the suitability of individual employees, reserving that issue for the compliance proceeding.

tion for "reconsideration, rehearing, or re-opening of the record." Even if Cobb could not have made a *FES* argument *before* issuance of the Board decision, its failure to move to reconsider (or reopen the record) bars it from raising the issue on appeal. *See Int'l Ladies' Garment Workers' v. Quality Mfg. Co.*, 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975); *Epilepsy Found. v. NLRB*, 268 F.3d 1095, 1102 (D.C.Cir.2001) (failure to move to reconsider issue precludes judicial review of issue); *Glaziers' Local 558 v. NLRB*, 408 F.2d 197, 203 (D.C.Cir.1969) (alleged misstatement of fact not brought to Board's attention by motion for reconsideration waived on appeal).

## B. Amount of Backpay Award

■ Cobb makes a variety of arguments challenging the amount of the backpay award. First, Cobb contends that the start date used to calculate backpay relies on the first day any employee was hired for the prison construction project rather than the first day a "newly-hired" employee was hired. *See* Cobb Br. at 33–34. It contends this was error because it had a policy of preferring current employees to new applicants and thus the Union applicants' start day for backpay purposes should be the date the new-hires began. Cobb's position, however, relies on hiring policies that ALJ Herzog conclusively determined "systematically exclude Union members from consideration for employment," *Herzog Decision* at 17.

■ Cobb also argues that the Board's calculation of backpay for pipefitter Union applicants is flawed because it should have used the date(s) on which Cobb hired pipefitters as the benchmark rather than the date(s) on which it hired *plumbers*. While it appears Cobb is correct that pipefitters may, at times, perform different services from plumbers, we agree with ALJ

Locke's determination that Cobb did not meet its burden of demonstrating that pipefitter applicants would not have been hired as plumbers. *Locke Decision*, 2001 WL 473984, at *4–*5. That employees in these positions performed roughly the same work at the Amarillo and Dalhart sites, that the apprenticeship programs for both positions are the same and that several requirements listed in Cobb's job descriptions for the positions are the same, *see* Cobb Position Description for "Plumber" and "Pipefitter," all suggest that the Board reasonably concluded that the backpay periods for the pipefitter discriminatees should begin when Cobb hired non-Union applicants as plumbers.

■ On the other hand, Cobb's argument that the plumber discriminatees would not have been hired on the dates that plumber helpers were hired because Cobb had a policy of not hiring plumbers to be plumber helpers has merit. In rejecting the argument, the Board relied on testimony that plumber applicants would have taken plumber helper jobs had those positions been offered to them, *see In re Cobb Mechanical Contractors, Inc.*, 333 NLRB No. 142, 2001 WL 473984, at *1. But Cobb contends that the plumber applicants would not have been offered the plumber helper jobs on those dates based on company policy. Several Cobb officials testified that the policy was long-standing and was intended to prevent overqualified plumbers from leaving plumber helper positions as soon as they were offered a higher paying plumber position elsewhere. *See, e.g.*, Testimony of Paula McKinney, Tr. 101 ¶ 12–23; Testimony of Jerry Bitner, Tr. 141–42. ALJ Locke concluded that Cobb's policy seemed "disingenuous" because, in light of Cobb's anti-union animus, it would welcome the turnover of Union employees. *Locke Decision*, 2001 WL 473984, at *9. In computing the back-

pay amount, however, Locke had to determine when the Union applicants would have been hired had Cobb had no anti-union animus. We remand this issue to the Board to reconsider Cobb's argument.

■ The final question involves the correct end date of the backpay periods. In *Dean General Contractors*, 285 NLRB 573, 1987 WL 89852 (1987), the Board employed a rebuttable presumption that an unlawfully discharged employee in the construction industry would have been transferred to a new project upon the termination of the project for which he had been employed initially. We too have recognized that the employer has the burden to rebut the presumption that an employee will be transferred to another project. *See Tualatin Electric, Inc. v. NLRB*, 253 F.3d 714, 718 (D.C.Cir.2001) (Board properly applied *Dean* presumption to discharged employees' backpay award calculations). In *Tualatin*, we also iterated the principle that "the party who has acted unlawfully should bear the burden of producing evidence for the purpose of limiting its damages." *Id.* ALJ Locke applied the *Dean* presumption and determined that Cobb had "not met its burden of proving that the discriminatees would not have been transferred to its other jobs." *See Locke Decision*, 2001 WL 473984, at *13. Locke considered whether Cobb's policy of favoring transferees over "new hires" rebutted the presumption and reasonably concluded that the policy "would support the opposite conclusion." *Id.* Cobb, however, faults

Locke for failing to consider evidence that only two newly-hired journeymen plumbers and pipefitters at the Amarillo and Dalhart sites transferred to other projects. Absent discrimination, the Union applicants would have been similarly situated to the newly-hired journeymen plumber and pipefitters because both groups would have been first time Cobb employees. In its brief the Board contends that Cobb is comparing the discriminatees to the wrong group of Cobb employees and that reliance upon generalized factors such as high turnover is impermissible. *See* Board Br. at 41–44. ALJ Locke, however, failed completely to address Cobb's evidence. We therefore conclude that Cobb's evidence that only two newly-hired employees on the Amarillo and Dalhart projects transferred to another Cobb project merits remand for the Board to reconsider which, if any, of the Union applicants would have transferred to a new Cobb project.

For the foregoing reasons, we deny Cobb's petition and grant the Board's cross-application for enforcement excepting the two issues we remand to the Board for reconsideration consistent with this opinion.

*So ordered.*